## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

———————————————————
                                              :
**NATHANIEL F. DAVIS, II**                    :
                                              :
   *Plaintiff*                 :
                                              :
**v.**                                        :  **Case No.: 8:19-CV-3605-CBD**
                                              :
**JAY CHANG KIM**, *et al.*                   :
                                              :
   *Defendant*                 :
———————————————————:

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION
### FOR PARTIAL SUMMARY DISPOSITION AND OPPOSITION TO
### <u>DEFENDANTS' RESPECTIVE MOTIONS FOR SUMMARY JUDGMENT</u>

Pursuant to 12 C.F.R. § 1081.212; the scheduling order issued in the above-captioned matter; and by Order of the Court, Plaintiff, Nathaniel V. Davis, II ("Plaintiff" or "Nathaniel") hereby mover for partial summary disposition and submits his opposition to Defendants' respective motions for summary judgment.  In support, Nathaniel states as follows:

### A. <u>Preliminary Statement</u>

On August 7, 2017, Nathaniel was brutally assaulted, detained, and arrested by employees, as well as an owner of J&H Beverage, Inc. dba Largo Liquors (the "Incident").  The Incident was caught on video, including audio recording (the "Video").  *See* the Video, attached as Exhibit Two (2) to Plaintiff's Complaint.[3]  Defendant Prince George's Police Department ("Defendant PGPD") filed a Motion for Summary Judgment which presents squarely disputed facts, including stating that Nathaniel "exchange[d] punches" with several of the other named

---

[3] Plaintiff shall also provide a copy of the Video and a separate audio file of the Video enclosed with a courtesy copy of this Motion to the Court.

Defendants in this action—an entirely fabricated statement.[4]  Further, Defendant PGPD's Motion for Summary Judgment (the "PGPD Motion") abbreviates the facts it relies on so significantly, that its presentation of those facts is entirely disputable by the Plaintiff.  The Largo Liquor Defendants' Motion for Summary Judgment (the "Largo Liquor Motion") is equally as depraved.

In reality, the  undisputed facts in this case are (in fact) undisputed because they are easily discernable from the "Video" upon review.  *See id.*  Nathaniel entirely disputes the Defendants' statements of facts given that Defendants' respective factual synopses leave out all of the detail regarding the painstaking, overreaching assault of Nathaniel—then a young African-American man of mild build—and also fail to account for the fact that Nathaniel's attackers included not one (1)—not two (2)—but three (3) substantially-statured non-African American grown men of varying ages of maturity, all of whom jumped Nathaniel after he knocked a few soft items off of the counter in the liquor store after being spitefully refused service by one of the store's clerks.  In fact, as a matter of law, it is the following causes of actions which *cannot* be overcome by certain Defendants to this action:

10. **Count I**:  Violation of Maryland Declaration of Rights Article 24 (Unlawful Seizure) against Defendants J&H Beverage and Jay Chang Kim.

11. **Count II**:  Violation of § 1983 (Unlawful Seizure) against Defendants J&H Beverage and Jay Chang Kim.

12. **Count III**:  False Imprisonment against Defendants J&H Beverage and Jay Chang Kim.

13. **Count VIII**:  False Imprisonment – Unlawful Citizen's Arrest against Defendants J&H Beverage and Jay Chang Kim.

---

[4] Defendants J&H Beverage, Inc dba Largo Liquors, Jay C. Kim ("Defendant J. Kim"), Venacio Gomez Garcia, Wallace Kent Roos, Jr. ("Defendant Roos"), Adam Kim ("Defendant A. Kim"), and Unidentified Employees of J&H Beverage, Inc. (the "Largo Liquor Defendants") joined in Defendant PGPD's Motion for Summary Judgment.

14.     **Count IX**:  False Arrest – Unlawful Citizen's Arrest Defendants J&H Beverage and Jay Chang Kim.

15.     **Count X**:  Battery – Against Defendants J&H Beverage and Jay Chang Kim.

16.     **Count XI**:  Assault – Against Defendants J&H Beverage and Jay Chang Kim.

17.     **Count XII**:  Intentional Infliction of Emotional Distress Against Defendants J&H Beverage and Jay Chang Kim.

18.     **Count XVI**:  Invasion of Privacy/False Light Against Defendants J&H Beverage and Jay Chang Kim.

19.     **Count XVII**:  Excessive Force against Defendants J&H Beverage and Jay Chang Kim.

**B.     <u>Undisputed Material Facts</u>**

The actual undisputed facts in this action are articulated herein below:

1.      Nathaniel Davis, II is an African American male who identifies as a part of the LGBTQ+ community.

2.      Defendants J. Kim, Roos, Gomez, and A. Kim are not African American.  *See generally* the Video.

3.      Defendant J. Kim is the owner and president of J&H Beverages, Inc. dba Largo Liquors.  *See* **Exhibit A**, at p. 1.

4.      Defendants Jarmon, Stawinski and Unidentified Police Officers are or were employees of the Prince George's County Police Department.  *See* PGPD's Motion, at p. 10.

5.      On August 7, 2017, at approximately 4:00 p.m., Nathaniel – then age twenty-four (24) – entered J&H Beverage dba Largo Liquors (the "Liquor Store") to purchase a spirit.  *See id.*, at 1:25.

6.      Just prior to Nathaniel entering the Liquor Store, Defendant J. Kim vacated the Store in order to smoke a cigarette.  *See id.*, at 0:44 – 1:12.  In doing so, Defendant J. Kim assigned an employee (the "First Clerk") to manage the Liquor Store cash counter where an elderly woman was then waiting, namely Pelicha Wilkerson ("Ms. Wilkerson" or the "Elder"). *See id.*

7.      As Nathaniel entered the Liquor Store, Ms. Wilkerson was in the process of being serviced at the counter by the First Clerk.  *See id.*, at 1:25.

8.      As Ms. Wilkerson continued to purchase lottery tickets from the First Clerk, the First Clerk became agitated with her.  *See id.*, at 1:48 – 2:03.  As a result, the First Clerk spoke to Ms. Wilkerson in a both a disrespectful and dismissive manner—from his perspective, it was unacceptable that she wanted to continue purchasing additional lottery tickets when, initially, she only requested two (2) tickets.  *See id.*  In fact, when Ms. Wilkerson began to communicate a third (3rd)  lottery number, the First Clerk said "nope, you're really not, I don't think number seven (7).  No, no, no, you asked me for two (2), you can't keep going . . . write it out, then I'll help you."  *See id.*

9.      Ms. Wilkerson attempted to calm the First Clerk by compliantly telling him, "okay, okay, okay, okay" and "thank you." *See id.*, at 1:51 – 2:01.

10.      Ms. Wilkerson waited at the counter for her turn to come again.  *See id.*, at 2:01 – 2:30.

11.      While waiting, Ms. Wilkerson wrote down the numbers she wanted to purchase and simultaneously told another customer that every day she comes to the Liquor Store and every day the First Clerk treats her similarly.  *See id.*, at 2:30-2:31.

4

12.     Instead of returning to serve Ms. Wilkerson, the First Clerk walks away from Ms. Wilkerson and goes off camera.  *See id.*, at 3:02.

13.     The First Clerk is then heard stating off camera and in the direction of the rear of the Liquor Store "you're queer."  *See id.* at 3:08.

14.     Nathaniel approached the counter from the rear of the Liquor Store to make his purchase.  *See id.*, at 3:20.  At that time, Ms. Wilkerson remained at the counter waiting for the First Clerk to service her as a customer.  *See id.*

15.     The First Clerk did not assist Ms. Wilkerson; instead, he serviced Nathaniel.  *See id.*, at 3:27.

16.     By that time, Ms. Wilkerson had watched at least two (2) persons serviced by the First Clerk (including Nathaniel) while she waited for the First Clerk to get back to her.  *See id.*, at 1:51 – 3:40.

17.     Ms. Wilkerson became visibly frustrated and, having heard the earlier commotion between the First Clerk and Ms. Wilkerson as to her attempt to purchase additional tickets, Nathaniel asked Ms. Wilkerson if she was alright.  *See id.*, at 3:42.

18.     Ms. Wilkerson responded to Nathaniel in the affirmative, but she informed Nathaniel that the First Clerk possessed an "attitude."  *See id.*, at 3:47.

19.     The First Clerk was visibly offended by Ms. Wilkerson's comment regarding his attitude and verbally confronted her by forcefully asking her what she said.  *See id.*, at 3:49.

20.     Nathaniel answered the First Clerk's question before Ms. Wilkerson had an opportunity to do so, telling him that Ms. Wilkerson said the First Clerk had "an attitude."  *See id.*, at 3:50.

21.     Forcefully, the First Clerk stated that he did "not have time to have an attitude or for whatever . . . [inaudible]." *See id.*, at 3:52.

22.     Nathaniel asked the First Clerk to calm down and told him there was no need for him to get an attitude if he was stating that he did not already have one. *See id.*, at 3:54-3:56.

23.     The First Clerk became visibly aggitated by Nathaniel and adopted a hostile posture toward him. *See id.*

24.     Immediately thereafter, instead of allowing Nathaniel to complete his purchase, the First Clerk removed the black bag containing the items Nathaniel intended to purchase and told him to go somewhere else. *See id.,* at 3:56-4:05.

25.     The First Clerk asked Nathaniel if he was going to tell him how to do his job, at which point Nathaniel become visibly upset. *See id.*, at 4:09.

26.     Nathaniel told Ms. Wilkerson that the First Clerk was ignorant, then faced the First Clerk to advise him that the way he acts compels people to become hostile toward him and then the First Clerk is surprised when the customer becomes hostile and blames the resulting conflict on the customer rather than accepting responsibility for his *attitude*. *See id.*, 4:10-4:13.

27.     As Nathaniel walked away, the First Clerk attempted to provoke Nathaniel to physical violence, repeatedly insisting that Nathaniel "do whatever [he] want[ed] to do." *See id.*, at 4:13 – 4:19.  The First Clerk promised "I'll give you the chance to throw the first punch," but added that that first punch would be all Nathaniel would get a chance to offer. *See id.*

28.     A second clerk (the "Second Clerk" or collectively, the "Store Clerks" or the "Clerks"), smirking, told the First Clerk that it would not be worth it. *See id.*

29.     Nathaniel did not punch the First Clerk; rather, he knocked over some items from the Liquor Store counter and again began to walk away. *See id.*, at 4:20 – 4:22.

30.     From outside of the Liquor Store, Defendant J. Kim heard the commotion going on inside the Liquor Store and ran inside.  *See id.*

31.     The First Clerk and the Second Clerk moved toward Nathaniel.  *See id.*, at 4:22.

32.     Upon reaching Nathaniel, the Second Clerk grabbed him around the chest.  *See id.*, at 4:23.

33.     The First Clerk then grabbed Nathaniel from his right side while the Second Clerk held Nathaniel from his left side.  *See id.*

34.     Nathaniel managed to escape both Clerks, but Defendant J. Kim came behind Nathaniel from outside of the Liquor Store and grabbed Nathaniel from the back such he held him on his right side while the First Clerk held him on his left side.  *See* 4:23 – 4:27.

35.     Nathaniel attempted to escape Defendant J. Kim and the Clerks, but Defendant J. Kim and the Second Clerk slammed Nathaniel into a glass refrigerator to prevent his escape of them.  *See id.*, at 4:32.

36.     Simultaneously, the First Clerk locked the door of the Liquor Store.  *See id.*

37.     The other customers attempted to intervene on Nathaniel's behalf.  *See id.*, at 4:36.

38.     The customers were told not to get involved by one of the Largo Liquor Defendants just as the First Clerk jumped back into the attack on Nathaniel, antagonizingly asking him, "where are you going."  *See id.*, at 4:43.  As a result, Nathaniel was under the force of all three (3) of the Largo Liquor Defendants.  *See id.*

39.     The First Clerk grabbed Nathaniel's neck while Defendant J. Kim and the Second Clerk held him against the glass window in the front of the Liquor Store.  *See id.*, at 4:44.

40.     The First Clerk then used the hold on Nathaniel's neck to pull Nathaniel to the ground from his then position in the air where  Defendant J. Kim and the Second Clerk were holding him.  *See id.*, at 4:45.

41.     Nathaniel crashed to the ground with all three (3) men on top of him.  *See id.*

42.     The other customers expressed outrage, screaming that the Largo Liquor Defendants did not have to "do that" to Nathaniel.  *See id.*

43.     Defendant J. Kim dug Nathaniel's face into the ground and swung his own leg over the other side of Nathaniel's back, sat on him, held him down, demanded that Nathaniel put his hands behind his back, and placed handcuffs on Nathaniel while Nathaniel lay on the ground in a fetal position.  *See id.*, at 4:57.

44.     Ms. Wilkerson observed that the Largo Liquor Defendants were choking Nathaniel and alerted loudly as to the same, repeatedly crying: "you're choking him."  *See id.*, at 4:59.

45.     Neither Defendant J. Kim, the First Clerk, nor the Second Clerk, did anything to address the fact that they were chocking Nathaniel; rather, they finished handcuffing him.

46.     Only then did Defendant J. Kim ask the Clerks, "[w]hat did [Nathaniel] do?"  *See id.*, at 5:15.

47.     The Second Clerk responded to Defendant J. Kim by stating rather casually, "[a]hhhh, he knocked all that stuff over."  *See id.*, at 5:16.

48.     The First Clerk handed Defendant J. Kim his cell phone as Defendant J. Kim began to shove Nathaniel antagonizingly around while he was handcuffed and lying on the ground.  *See id.*, at 5:26.

49.     After Nathaniel finally got up on his feet, Defendant J. Kim instructed him to sit down and told him that he would not be going anywhere. *See id.*, at 6:10.

50.     Defendant J. Kim began laughing and asking Nathaniel if he wanted to play. *See id.*, at 6:21.

51.     The First Clerk began reorganizing what appeared to be a pack of blunts which is what fell off the counter as a result of Nathaniel's knocking the objects off of the Liquor Store Counter. *See id.*, at 7:49.

52.     Defendant J. Kim stood over top of Nathaniel, forcing Nathaniel to remain seated and detaining him at the Liquor Store. *See id.*, at 6:30 – 12:05.

53.     When Nathaniel became upset again while seated in the Liquor Store in handcuffs, Defendant J. Kim told him not to play the race card:

> [d]on't even play that race card . . . good God, ya'll always play that race card . . . everything you don't like is being rude or now its racist all the time, oh you're doing this because I'm a black man, this and that, that's got nothing to do with nothing.[5]

*See id.*, at 12:45 – 13:14.

54.     The Second Clerk commented in response to Defendant J. Kim: "[h]e was trying to play the game." *See id.*, at 13:27.

55.     Defendant J. Kim kicked Ms. Wilkerson out of the Liquor Store who was, by then, waiting with Nathaniel for the police and trying to reach Nathaniel's mother on the telephone. *See id.*, at 15:37 – 17:40.

56.     During the Incident, Defendant J. Kim repeatedly accused Nathaniel of "breaking [his] shit" and damaging his property. *See generally id.*

---

[5] Using the term "race card" is, in and of itself, racist."

57.     No property was damaged as a result of Nathaniel knocking the items off the Store Counter; of particular import, no broken items are located following the Incident.  *See id.*, at 7:49.

58.     Although Defendant J. Kim was outside during the entirety of the initial encounter between the First Clerk and Nathaniel, Defendant J. Kim told Nathaniel that no one made him do anything.  *See id.*, at 16:56.

59.     Defendant J. Kim told Nathaniel that he "gonna be getting' charged with disorderly if [he] don't calm down."  *See id.*, at 10:10.

60.     The Second Clerk was amused when Defendant J. Kim kicked the witness out of the Liquor Store and chuckles.  *See id.*, at 17:53.

61.     The First Clerk and Defendant J. Kim began video recording Ms. Wilkerson as she stood upset outside the Liquor Store.  *See id.*, at 17:50.

62.     Ms. Wilkerson was both visibly and audibly upset about the Incident, including that Defendant J. Kim kicked her out of the Liquor Store while Nathaniel was forced to sit inside the Liquor Store in handcuffs with no police present.  *See id.*, at 18:36.  Defendant J. Kim advised Ms. Wilkerson to "keep acting just like the way" she was then acting.  *See id.*

63.     At all times during the Incident, someone stood guard at the door of the Liquor Store.  *See generally id.  See also id.*, at 26:44.

64.     The Video clearly depicts at least twenty-six (26) patrons coming in and out of the Liquor Store during the Incident, enabling them to observe Nathaniel's embarrassing and

humiliating condition.[6]  *See generally id.*

65.     Defendants J. Kim, Roos, Gomez, and. A. Kim do not possess credentials as special police officers; rather, Defendant J. Kim was not , until August 20, 2017.  See **Exhibit B**. See also COMAR 29.04.02.03, attached hereto as **Exhibit B** (stating that certifications last for two (2) years and expire at the end of a term).

66.     Officer PFC Jarmon from the Prince George's County Police Department (the "PGPD") arrived at the Liquor Store and found Nathaniel still in handcuffs.  *See id.*, at 28:55 – 29:16.  *See also* Affidavit of Corporal Brett Jarmon, at ¶ 10, attached hereto as **Exhibit C**.

67.     PFC Jarmon inquired of Defendant J. Kim as to why Nathaniel's freedom had been restricted, but all he learned was that Defendant J. Kim had placed the handcuffs on Nathaniel.  *See* the Video, at 28:55-29:16.  *See also* **Exhibit C**, at ¶ 5.

68.     Defendant J. Kim advised the officer to speak with Nathaniel about why he was in the handcuffs.  *See* the Video, at 28:55-29:16.  The, Defendant J. Kim walked out of the Liquor Store while PFC Jarmon moved toward the rear of the store to further discuss the Incident.  *See id.*

69.     As a result of the Incident, PGPD replaced the handcuffs on Nathaniel with PGPD handcuffs and placed him in a PGPD cruiser.  *See* **Exhibit C**, at ¶ 10.

70.     PGPD reviewed the footage on the Video which depicted that the Largo Liquor Defendants' treatment of Ms. Wilkerson upset Nathaniel, that that treatment led to

---

[6] Defendants' attempts to dispute this fact is without merit as one need only view the Video and count the individuals coming in and out of the store.  *See id.*  In doing so, one will find that at least twenty-six (26) persons visited the Liquor Store while Nathaniel was detained by the Largo Liquor Defendants.  *See id.*  Many of those individuals can be seen staring at Nathaniel and others can be heard inquiring about why he is detained inside the Liquor Store.  *See id.*  Still others laugh as to the response the receive regarding the same.  *See id.*

a verbal dispute between Nathaniel and the Largo Liquor Defendants; and that the Largo Liquor Defendants engaged in a physical altercation with Nathaniel after Nathaniel "knocked over some store property that was on the cash counter," restrained Nathaniel, and handcuffed Nathaniel. *See id.*, at ¶¶ 6-7, 9, 11-12.

71.     At no time did PCF Jarmon or any other PGPD officer inquire as to warrants regarding any of the Largo Liquor Defendants who initiated the physical altercation with Nathaniel.  *See generally id.*

72.     Nathaniel did receive a citation for disorderly conduct, but the charges against him were dropped for lack of evidence that he was, in fact, disorderly.  *See* **Exhibits D and E**.

73.     No Largo Liquor Defendant received a citation and no charges were held against the Largo Liquor Defendants, but the State's Attorney announced that Defendant J. Kim would face charges of Second Degree Assault, but later dropped the charges without articulating a reason to the public.  *See* **Exhibit E**.

74.     Nathaniel suffered injuries as a result of the Incident, including, but not limited to a hip injury, a head injury, multiple abrasions and flank pain.  *See* **Exhibit F**, at No. 12**.  *See also* Exhibit G**.

75.     Nathaniel also suffered emotional pain in response to the Incident, as well as humiliation, embarrassment, degradation, stress, anxiety, and despair.  *See* **Exhibit F**, at 13.

76.     As a result of the Incident, Nathaniel was forced to take a leave of absence which led to further disenfranchisement in his place of work and his eventual termination.  *See* **Exhibit F**, at ¶ 17.  *See also* **Exhibit H.**

77.     On February 21, 2018, a citizens' petition was filed against the Liquor Store (the "Petition"), requesting that its license not be renewed and explaining that Largo Liquors had "a deleterious effect on the community."  *See* **Exhibit I**.

78.     The Petition, supported by ten (10) hand signatures and at least six-thousand, two hundred and nineteen (6,219) electronic signatures, offered at least six (6) reasons to support the Petition, including, but not limited to:

a.     The alleged "Citizen's Arrest" at issue in this Complaint.  The Incident is described in the Petition and identifies the Defendant Employees and Defendant Kim as the aggressors of the Incident.  The Petition further identities the force used in seizing Nathaniel as "an unnecessary use of force;"

b.     The Owner, Defendant Kim, repeatedly instigates disturbances on the premises;

c.     The Owner, Defendant Kim approached a citizen in the parking lot of the shopping center where the Liquor Store is located, aggressively confronted him, chased him down in the parking lot, and assaulted him.  The petitioners further state that such is the frequent behavior and/or demeanor of Defendant Kim as to his customers;

d.     The owner, Defendant Kim, is unfit to hold a liquor license because he is consistently discourteous to customers and/or treats them with malice;

e.     The Liquor Store Employees are unnecessarily aggressive with customers, inciting them to violence and treating them dismissively and without value; and

f.     The manner of operations of the Liquor Store disturbs the peace, safety and tranquility of the neighborhood and is generating antisocial and unsafe activities through its business operations.

*See id.*

79.     On April 11, 2018, a Protest Public Hearing was held as to the Petition filed against Largo Liquors.  At least forty-seven (47) private citizens showed up at the hearing to testify against Largo Liquors.  *See* **Exhibit A**.

80.     On April 19, 2019, Terrence Sheppard, then-director of the Board of License Commissioners for Prince George's County Government, issued a decision, stating that the Liquor Store's license would only be renewed if it met the following conditions:

a.      Work with PGPD to implement a security plan;

b.      Utilize a sworn officer beginning at 3:00 p.m.;

c.      Obtain certifications in customer service and/or conflict resolution for all of the Liquor Store's employees and/or staff; and

d.      Prepare documented procedures and principles related to customer service and conflict resolution.

*See* **Exhibit J**. [7]

**C.      <u>Standard of Review</u>**

The availability of summary disposition depends on the answer to the question:  Does a proper jury question exists as to a genuine issue of material fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–51, 106 S. Ct. 2505, 2510–12, 91 L. Ed. 2d 202 (1986).  Where a reasonably minded juror would not draw an inference from the circumstances as to the cause of action alleged, summary judgment is appropriate.  *See id.*  Where a reasonably minded juror would do so, summary judgment must be denied.  *See id.*  Therefore, a motion for summary

---

[7] The physical and emotional toll this Incident placed on Nathaniel forced him to take a temporary leave of absence from Transportation Security Administration ("TSA") and for him to, subsequently, be terminated from his employment there.

disposition must demonstrate that, in consideration of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

(1) there are no genuine issues of material fact; and

(2) the moving party is entitled to a decision in its favor as a matter of law.

*See* 12 C.F.R. § 1081.212.  S*ee also Nader v. Blair*, 549 F.3d 953, 958 (4th Cir. 2008);  *see Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003).  The Court construes the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in the non-movant's favor.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

2. *Materiality*.

Only facts that are material, such that they might affect the outcome of the suit when considered within the context of the law will preclude the entry of summary judgment.  *See Anderson,* 477 U.S. 242, at 248–51 (1986).  On the other hand, factual disputes that are irrelevant or unnecessary are not material and shall not disqualify the Court from summarily ruling in favor of the moving party.  *See id.  See also Bouchat*, 346 F.3d 514, at 519 (4th Cir. 2003).  Thus, the Court must first make an evidentiary inquiry before making its decision as to the appropriateness of granting a motion for summary judgment; that is to say, the Court must initially determine which facts are critical under the applicable law and which are irrelevant.  *See Anderson, 477 U.S. 242, at 248-51 (1986).*

3. *Genuineness of Disputes*

Where a fact found by the Court to be material is disputed by the parties, the Court must determine whether the parties' dispute is, in fact, genuine.  *See id.*  A dispute is genuine where a reasonable jury could return a verdict for the nonmoving party.  *See id.*  A party opposing

summary judgment must root his argument as to the dispute in specific facts in order to demonstrate that a genuine factual dispute does so exist which will necessarily require that a jury or judge resolve the differing versions in pursuit of the truth during a trial.  *See id.*

4.      *Burden of Proof*

The moving party must support their argument as to the dispute with significant probative evidence tending to support their position and, to do so, must specifically inform the Court of the portions of the record which it believes demonstrates the absence of a genuine issue of material fact.  *Celotext Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  If the movant fails to so demonstrate, the Court has "an affirmative obligation . . . to prevent factually unsupported claims and defenses[.]"  False renditions of such facts and intentional misrepresentations are sanctionable by the Court.  *See* Am. Sci. & Eng'g, Inc. v. Autoclear, LLC, 606 F. Supp. 2d 617, 626 (E.D. Va. 2008).

If the moving party presents a truthful argument that there is no genuine issue of material fact, the non-moving party has the burden of setting forth specific facts showing that, in actuality, there is such a genuine issue of material fact.  *See Catrett*, 477 U.s. 317, 327 (1986).  Even where facts are undisputed as facts, but there exists a difference in the weight afforded those facts according to the parties' varying perspectives, if the Court finds that the reasonable minds of a jury could differ as to the import of the evidence provided by the movant or the nonmovant, a motion for summary judgment must be denied.  *See Anderson, 477 U.S. 242, at 248-51 (1986).*

5.      *Discrimination Actions*

Generally, courts must take special care when considering a motion for summary judgment in a discrimination matter because motive is often a critical issue; however, summary

judgment remains appropriate if the Defendant(s) cannot prevail as a matter of law.  *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir. 1996).

**D.**     **Argument**

There is no basis upon which to grant Defendants' respective motions for summary judgment; rather, the Court must uphold each cause of action articulated in Nathaniel's Complaint and grant summary judgment in his favor as to at least ten (10) counts as they are alleged against Defendants J&H Beverage dba Largo Liquors and, its owner, Jay Chang Kim. Below, all three (3) respective motions are discussed in turn.

**1.**     **PLAINTIFF'S MOTION FOR SUMMARY DISPOSITION**

As described herein below and as a matter of law, the Court must enter summary judgment in Nathaniel's favor against Defendants J&H Beverage dba Largo Liquors and Jay Chang Kim since an officer of a corporation may be held personally liable for torts committed by the corporation if the officer "either specifically directed, or actively participated or cooperated in," the corporation's conduct.  *See St. James Const. Co. v. Morlock*, 89 Md. App. 217, 223, 597 A.2d 1042, 1045 (1991) (citing *Fletcher v. Havre de Grace Fireworks Co.,* 229 Md. 196, 201, 183 A.2d 386 (1962)).

a.     *Article 24 Violation of Maryland Declaration of Rights – Unlawful Seizure; Unlawful Citizen's Arrest; False Imprisonment; and False Arrest.*

Actions brought under Article 24 of the Maryland Declaration of Rights are governed by common law tort principles.  *See Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 209 (4th Cir. 2002).  As in *Randall*, Nathaniel's claim is that he was unconstitutionally seized and detained against his will; therefore, it should be considered within the context of the common law tort of false imprisonment.  *See id.*  False imprisonment occurs—whether by violence, threats, or otherwise—when there is any deprivation of the liberty of another without his consent.

*See Fleisher v. Ensminger*, 140 Md. 604, 118 A. 153, 159 (1922) (*citing Bernheimer v. Becker*, 102 Md. 254, 62 Atl. 526, 3 L. R. A. (N. S.) 221, 111 Am. St. Rep. 356). If such a deprivation occurs unlawfully, it constitutes a false imprisonment without regard to whether it is done with or without probable cause. *See id.*, (*citing Lewin* v. Uzuber, 65 Md. 341, 4 Atl. 285). Since neither J&H Beverage, nor Jay Chang Kim possessed credentials to make an arrest at the time of the Incident and since it is clear from the Video that Nathaniel did not consent to the deprivation of his liberty at the time of the Incident, whether the Largo Liquor Defendants' seizure of Nathaniel was unlawful therefore turns on whether said Defendants made a valid citizen's arrest of Nathaniel's person. *See* **Exhibit B**.

A valid citizen's arrest of Nathaniel could only have occurred in two (2) instances. First, if (i) the Largo Liquor Defendants believed that a felony had been committed and (ii) Nathaniel was responsible for that felony. *See Stevenson v. State*, 287 Md. 504, 515, 413 A.2d 1340, 1346 (1980). Or otherwise, where a misdemeanor was being committed in the presence or view of the Largo Liquor Defendants, the extent of which amounted to a breach of the peace. *See Great Atl. & Pac. Tea Co. v. Paul*, 256 Md. 643, 655–56, 261 A.2d 731, 738–39 (1970). A breach of the peace exists where one's conduct is both disorderly **and** dangerous. *See id*. Further the disorderly, dangerous conduct must also be disruptive of the public peace. *See id.*

As a matter of law, haphazardly knocking a few items off of a counter in frustration can never amount to a felony in any court of law.[8] Felonies are crimes which are punishable by at least one (1) year in jail. *See generally* the Criminal Law Article of the Maryland Annotated Code. In Maryland any crime which is punishable by less than one (1) year of incarceration is considered a misdemeanor. *See id.* In the instant matter, the citation issued to Nathaniel for carried with it a possible sixty (60) day jail sentence or a $500 fine. *See* § 10-201(d).

---

[8]

The act of knocking over the soft items from the Liquor Store counter also did not amount to disorderly conduct.  Rather, the First Store Clerk threatened to assault Nathaniel immediately prior to the moment in which Nathaniel knocked the items over and, having knocked them off the counter, the items fell significantly far away from any individual present in the Liquor Store, including the First Store Clerk.  *See Paul*, 256 Md. 643, 655–56, (1970).  Therefore Nathaniel actions were not dangerous.  *See id.*  Danger is a necessary element of disorderly conduct.  *See id.*  If there existed no danger, a citizen's arrest of Nathaniel's person was baseless and unwarranted.  *See id.*

More to that point, the State of Maryland bans words that amount to personally abusive epithets that when addressed to an ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction.  *See Reese v. State*, 17 Md. App. 73, 80–81, 299 A.2d 848, 854 (1973).  Such words are commonly referred to as "fighting word" and they include the words used by the First Clerk wherein he deliberately sought to instigate a physical fight between himself and Nathaniel, requesting that Nathaniel throw the first punch and informing him that when he threw that punch, it would be the only punch he would be able to land.  *See id.  See also*, Nathaniel's Statement of Undisputed Material Facts, at ¶¶ 24-28.  It is not uncommon for the party actually guilty of a breach of the peace to act quietly or secretly; in fact, at common law this was often the case, such as when a person challenged someone to a duel.  See  CONDUCT, Black's Law Dictionary (11th ed. 2019) (citing Francis Barry McCarthy, "Vagrancy and Disorderly Conduct," in 4 *Encyclopedia of Crime and Justice* 1589, 1589 (Sanford H. Kadish ed., 1983)).  That being said, the First Clerk also earlier referred to Nathaniel as "queer," saying "you're queer," upon noticing Nathaniel's presence in the Liquor Store, but Nathaniel did not hear that comment until he had the opportunity to review the Video himself.

*See* Nathaniel's Statement of Undisputed Material Facts, at ¶ 13.  Regardless, it is clear from the First Clerk's comment that he begrudged the queer Black Nathaniel telling him how to do his job. *See id.*, at ¶¶ 24-28.

The First Clerk's words may have invoked a reaction in Nathaniel, but that reaction did not amount to violence because violence generally includes an intent to harm and the Video clearly demonstrates that Nathaniel had no such intent, but merely became frustrated in his belief that the Liquor Store mistreated its Black customers.  See generally, the Video.  See also VIOLENCE, Black's Law Dictionary (11th ed. 2019).  And, to the extent the First Store Clerk incited Nathaniel's reaction, Nathaniel's reaction was not willful as is required by the statute because an act cannot by definition be willful if it is an act which has been provoked.  See Md. Code Ann., Crim. Law § 10-201 (West).  A provocation, by its very nature, eliminates a person's will power.  See PROVOCATION, Black's Law Dictionary (11th ed. 2019) (defining the term as "[s]omething (such as words or actions) that affects a person's reason and self-control, esp. causing the person to commit a crime impulsively").  As a result, the Largo Liquor Defendants could not have made a valid citizen's arrest under the law and the Court must grant summary judgment as to Counts I, II, and VIII against both J&H Beverage, Inc. dba Largo Liquors and Defendant J. Chang.

Additionally,  the elements of false arrest and false imprisonment are identical: (1) the deprivation of the liberty of another; (2) without consent; and (3) without legal justification.  *See Gray v. Maryland*, 228 F. Supp. 2d 628, 641 (D. Md. 2002) (citing *Heron,* 761 A.2d at 59.).  Where the basis of a false arrest action is an arrest by a citizen, the liability of the citizen will ordinarily depend upon whether or not the citizen acted within his legal authority to arrest.  *See* Heron, 751 A2.d, at 59 (*quoting Montgomery Ward,* 664 A.2d at 926).  Again, where as here, the

20

Largo Liquor Defendants had no reason to believe that Nathaniel committed a felony and no reason to believe either he or his actions were dangerous, their arrest of him was simply a brutal gang bang.  See no lawful citizen's arrest can attach their actions.  *See Stevenson*, 287 Md. 504, 515 (1980).   *See Paul*, 256 Md. 643, 655–56 (1970).   As such, this Court must also grant summary judgment as to Count IX against both J&H Beverage, Inc., dba Largo Liquors and Defendant J. Chang.

        *b.*       *Violation of Section 1983—Unlawful Seizure.*

        To establish a violation of Section 1983, Nathaniel must prove that the Largo Liquor Defendants engaged in conduct which deprived plaintiff of a federal constitutional or statutory right, (2) that they were acting under color of law when they did so, and (3) that the acts of that defendant proximately caused the plaintiff's damages.  *See Smith v. Town of S. Hill*, No. 3:19CV46, 2020 WL 1324216, at *10 (E.D. Va. Mar. 20, 2020).   In conducting an illegal citizen's arrest, including forcing his hand behind his back; handcuffing him; and detaining him on the Liquor Store premises, the Largo Liquor Defendants acted under the color of law, causing Nathaniel physical, mental, emotional, and economical damages.  *See generally* the Video.  *See also* Statement of Undisputed Material Facts, at ¶¶ 58-59 (*supra*).   Should this Court grant summary judgment as to Counts I, II, IIIV and/or IX, it must also grant summary judgment as to Count II.

        *c.*       *False Light Invasion of Privacy.*

        False light invasion of privacy occurs when a defendant gives publicity to a matter which places the plaintiff before the public in a "false light" that would be highly offensive to a reasonable person and where the defendant had knowledge of the falsity of—or acted in reckless disregard as to the falsity of—the publicized matter.  *See D&A Designs LLC v. Fox Television*

*Stations, LLC*, No. CV JKB-20-2993, 2021 WL 100803, at *5 (D. Md. Jan. 12, 2021) (citing *Furman v. Sheppard*, 744 A.2d 583, 587 (Md. Ct. Spec. App. 2000)).  In handcuffing and detaining Nathaniel on the premises of the Liquor Store, the Largo Liquor Defendants gave the false impression that they had the authority to do so.  In other words, that they possessed the right to conduct a citizen's arrest of his person—a right that could only arise if they suspected that Nathaniel had committed a felony or acted in dangerous manner.  *See* § D(1)(a) (*supra*).  *See also Stevenson*, 287 Md. 504, 515 (1980); *Paul*, 256 Md. 643, 655–56 (1970).  As previously discussed herein, the Largo Liquor Defendants had no such suspicion and, therefore, no such right.  *See id*.  More to that point, the Largo Liquor Defendants had knowledge of the falsity inherent in their actions, particularly since the First Store Clerk requested that Nathaniel punch him first in effort to instigate a fight and the Second Store Clerk observed the entire encounter between the First Store Clerk and Nathaniel.  *See* the Statement of Undisputed Material Facts., at § B, ¶¶ 27-28 (*supra*).

Since Defendant J. Chang failed to inquire as to what Nathaniel did before joining the much younger Store Clerks in the brutal beatdown of Nathaniel, the more mature Defendant J. Chang at least acted with reckless disregard in securing control over Nathaniel's person; further, Defendant J. Chang then became aware that the Store Clerks were assaulting Nathaniel.  *See id.*, at ¶¶ 43-60.  When he finally inquired as to what Nathaniel did to earn the violent attack, the Second Store Clerk casually responded, "[a]hhhh, he knocked all that stuff over."  *See the Video*, at 5:16; *see also* § B, ¶ 43 (*supra*).  At that point, Defendant J. Chang could have reevaluated his position as to Nathaniel; instead, he doubled down, loudly announced several times that Nathaniel was "breaking [his] shit," and detained him in the Liquor Store, handcuffed, for over twenty (20) minutes.  *See* § B, ¶ 52 (*supra*).  The Largo Liquor Defendants'

conduct resulted in over twenty-six (26) patrons viewing Nathaniel's detainment, giving them the false impression that Nathaniel performed a criminal act which amounted to a felony.  *See id.*, at ¶ 60 (*supra*).

Anytime an individual is wrongfully represented as having committed a felony crime it is a forgone conclusion that citizens who come to understand that misrepresentation will view the individual with public scorn, hatred, contempt, or ridicule and, as such, be discouraged from having a good opinion of, or associating with, that person.  The American criminal justice system is devised to communicate that exact character assassination as to  felony criminals.  *See e.g. Hamilton v. Pallozzi*, 165 F. Supp. 3d 315, 327 (D. Md. 2016), aff'd, 848 F.3d 614 (4th Cir. 2017) (citing *United States v. Everist*, 368 F.3d 517, 519 (5th Cir.2004) ("Irrespective of whether his offense was violent in nature, a felon has shown manifest disregard for the rights of others. He may not justly complain of the limitation on his liberty [and] otherwise threaten the security of his fellow citizens.")).  Therefore, we, as Americans, go to great lengths to ensure that law abiding citizens are not only aware that a felon—though he may be free—remains a felon, but we expect our government to protect us from freed felons, interact with them only when taking precautions and otherwise prohibit them from certain locations, activities, encounters, or experiences.  It naturally follows that any reasonable person would consider such a false representation of an individual's character to be highly offensive.   Consequently, this this Court must grant summary judgment as to Count XVI against both J&H Beverage, Inc., dba Largo Liquors and Defendant J. Chang.

       *d.*     *Assault, Battery, and Excessive Force.*

An "[A]ssault is (1) an attempt to commit a battery *or* (2) an intentional placing of another in apprehension of receiving an immediate battery." *See Green v. Pro Football, Inc.*, 31

F. Supp. 3d 714, 726 (D. Md. 2014) (*quoting* Lamb v. State, 93 Md. App. 422, 441, 613 A.2d 402, 411 (1992)).  A battery occurs when one intends a harmful or offensive contact with another without that person's consent.  *See id.* (*citing Nelson v. Carroll,* 355 Md. 593, 735 A.2d 1096, 1099 (1999)).  To the extent no valid citizen's arrest occurred, it is therefore clear from the Video that the Largo Liquor Defendants committed both an assault and battery upon Nathaniel's person.  *See generally* the Video.  As such, this Court must grant summary judgment as to Counts X and XI against both J&H Beverage, Inc., dba Largo Liquors and Defendant J. Chang.

It is also clear from the Video is that—to whatever extent the Largo Liquor Defendants were attempting to (and did) arrest Nathaniel—they used excessive force to do so.  An excessive force determination is made by balancing three (3) factors:  (1) the severity of the crime at issue; (2) the extent to which the suspect posed an immediate threat to the safety of the individuals carrying out the arrest or others; and, (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  *See Wilson v. Prince George's Cty., Maryland*, 893 F.3d 213, 220 (4th Cir. 2018).  The evaluation must be made based on a standard of objective reasonableness.  *See id.*  Knocking some items off of a counter <u>cannot</u> be considered a severe crime under the circumstances then occurring as a part of the Incident; in fact, Defendant PGPD noted Nathaniel's conduct as "disorderly" in the citation issued to Nathaniel and the Largo Liquor Defendants agree with that characterization.  *See* **Exhibit D**.  At most, Nathaniel's conduct offended public morals, but it was not dangerous enough to have amounted to a breach of the peace, nor significant enough to undermine public safety, particularly where the real individual causing the breach of the peace was the First Clerk who is easily comparable to someone who, at common law, may have challenged someone to a duel.  See CONDUCT, Black's Law Dictionary (11th ed. 2019).  In other words, Nathaniel's conduct, posed no

24

immediate threat to anyone's safety at the time of the Incident; and his resistance of the arrest conducted by the Largo Liquor Defendants was directly proportionate to his impression that a person who was not a member of law enforcement had threatened to beat him up; and then did beat him up with the assistance of two (2) other persons who also were not members of law enforcement.

In consideration of those facts and in that context, as well as in consideration of all of the undisputed material facts articulated herein, especially those facts which are easily observable on the Video, there is no possibility that any reasonable person would consider the force employed against Nathaniel to have been reasonable.   In fact, all of the patrons of the Liquor Store during the Incident were audibly outraged at the Largo Liquor Defendants' conduct toward Nathaniel and at least one (1) of those patrons expressed dire concern for Nathaniel's life, repeatedly yelling.  "you're choking him, you're chocking him, you're chocking him."  *See* the Video at 4:44-4:59.  This Court must, therefore, grant summary judgment as to Count XVII against both J&H Beverage, Inc., dba Largo Liquors and Defendant J. Chang.

## 2. <u>DEFENDANT PGPD'S MOTION FOR SUMMARY JUDGMENT</u>

Nathaniel disputes the entirety of the statement of material facts set forth in Defendant PGPD's motion since it significantly dilutes what took place during the Incident between the Parties.  Additionally, Nathaniel sets forth specific disputes as to statements delineated as facts in the PGPD Motion herein below:

### a. **Disputed Facts**

In reviewing PGPD's Motion for Summary Judgment, Nathaniel learned that PFC Jarmon was the officer depicted in the Video and the first officer he encountered as a result of the Incident.  *See* Affidavit of Nathaniel Davis, II, attached hereto as **Exhibit K**.  Previously,

he believed that the officer who signed the citation was the plain clothes officer who was supervisory over PFC Jarmon and instructed PFC Jarmon to issue a citation to Nathaniel when had previously communicated his intent to release Nathaniel without charge on the basis of the Video. *See id.* Nathaniel therefore disputes any narrative which does not include that PFC Jarmon initially intended to release him without citation because there was, in fact, a plain clothes officer who was supervisory to PFC Jarmon present at the scene; Nathaniel did hear Defendant J. Kim invite an officer to come to scene as a result of the Incident; and that plaint clothes officer did insist that PFC Jarmon issue Nathaniel a citation for disorderly conduct prior to releasing him. *See id.* The materiality of this fact speaks directly to whether any police misconduct occurred in issuing the citation, particularly where Nathaniel observed and overheard Defendant J. Kim make a casual telephone call to a police officer, requesting his presence at the Liquor Store as a result of the Incident using casual language and discussing what they were going to charge him with. *See id.* In response to that dialogue, Nathaniel tried to plead his own case, stating that he was a TSA Officer and this Incident that was being accused of was not within his character, among other things. *See* the Video.

What is undisputed that PGPD reviewed the footage in the Video which depicted that the Largo Liquor Defendants treatment of Ms. Wilkerson upset Nathaniel; that that treatment lead to a verbal dispute between Nathaniel and the Largo Liquor Defendants; that the Largo Liquor Defendants engaged in a physical altercation with Nathaniel after Nathaniel "knocked over some store property that was on the cash counter," restrained Nathaniel, and handcuffed Nathaniel. *See* **Exhibit C**, at ¶¶ 6-7, 9, 11-12.

**b.      Argument**

1. *Defendant PGPD is a Proper Party and this Court Either Has Personal Jurisdiction Over All PGPD Defendants Named or Is Able to Obtain the Same.*

Defendant PGPD attempts to secure the dismissal of this action on the basis that it is not a proper party, but, not only is it time barred from securing such a dismissal, it is, in fact, a proper party.  Defendant PGPD filed an Answer in this matter, entitled:  *Price George's Police Department's Answer to Complaint*.  *See* Docket, at No. 13.  Although, its Answer states therein that "it is not the proper party," by only stating as much, Defendant PGPD fails to comply with Fed. R. Civ. Pro. 12(b) which sets forth specific defenses that must be "asserted in the responsive pleading if one is required" or upon a motion made before a responsive pleading.  To the extent, Defendant PGPD believed itself not to be a proper party, it should have raised a proper defense, namely under Rule 12(b)(2), lack of personal jurisdiction; Rule 12(b)(4), insufficient process; Rule 12(b)(5), insufficient service of process; or Rule 12(b)(7), failure to join a party under Rule 19.  To the extent PGPD failed to do so (which it did so fail to do), it cannot now claim that it is not a legal entity capable of being sued because "[a] motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed," not made in its motion for summary judgment .  *See* Fed. R. Civ. P. 12.

Even if Defendant PGPD is an incorrect party, pursuant to Fed. R. Civ. Pro 19, Defendant PGPD held a duty to inform the Court that a different person or entity needed to be joined as a party to the action to enable the Court to issue an order requiring the same.   In fact, the legal precedent relied upon in its own motion is *Hines v. French*, 157 Md. App. 536, 573, 852 A.2d 1047, 1068 (2004) which does not, as Defendant PGPD claims, "affir[m] dismissal of claims against the Baltimore County Police Department ["BCPD"] on ground [*sic*] that a county police department could not be viewed as a separate legal entity;" rather, it upholds the dismissal

27

of the BCPD as a party because "naming the BCPD as a separate defendant was improper _and_ unnecessary." *See* PGPD's Motion, at p. 9.  See also Hines, 157 Md. App. 536, 573 (2004) (*emphasis added*).  Had Baltimore County not also been named as a party in that action, it can be inferred that the Court may not have come to the conclusion that dismissal of BCPD as a party to the action was appropriate, correct, or in the interest of justice.  As such, and because it is in fact untimely, any argument made by Defendant PGPD that it is not a proper party to the suit should be regarded as time barred, barred as an improper defense; and/or barred as unjust.

Even if its claim was not untimely and waived, Defendant PGPD is a legal entity capable of being sued."  Md. Code, Cts. & Jud. Proc. § 5-304 provides that an action for unliquidated damages may be brought against both a local government and/or its employees so long as notice is provided pursuant to the statute.  Defendant's Answer admits to receiving such notice.  *See* Docket at No. 13, ¶¶ 31-33.

Further, to the extent PGPD and its officers are employees of Prince George's County, then it and its officers are capable of being sued.  *See id.  See also Harris v. Howard Cnty. Police Dep't*, No. 2655, at *4 n.1 (Md. Ct. Spec. App. Jan. 13, 2016) (including other citations for local government agencies that have, in the name of those agencies, been sued); Phillips, 413 Md. 606, 630 (2010).  According to the Maryland Government Tort Claims Act, the term "employee" means "any person who was employed by a local government at the time of the act or omission giving rise to potential liability against that person[, . . . including [a]ny employee, either within or without a classified service or merit system; [a]n appointed or elected official; or [a] volunteer who, at the request of the local government, and under its control and direction, was providing services or performing duties.  *See* Md. Code, Cts. & Jud. Proc. § 5-301.  In addition to Black's Law Dictionary defining "employee" as  [a person] who works in the service of another person

(the employer) under an express or implied contract, under which the employer has the right to control the details of work performance, in Maryland, the term "person" includes county and local government entities. *See Washington Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 630 (2010); EMPLOYEE, Black's Law Dictionary (11th ed. 2019).

As to Defendant PGPD's claims that this action should be dismissed as to Defendant's Stawinski, Jarmon, and Unidentified Prince George's County police officers, PGPD and its employees are preluded from achieving such a dismissal. On or about December 20, 2019, Plaintiff hired the Prince George's County Office of the Sherriff (the "Sherriff") to serve Defendant PGPD, Defendant Stawinski and Defendant Jarmon. No later than January 25, 2021, the Sheriff, did serve each summons issued to them at their respective places of employment; however, somewhere in the midst of the beginning of the Pandemic, all of the Affidavits of Service were not transmitted back to undersigned counsel or filed with the Court. Undersigned counsel is presently working with the Sheriff and the Circuit Court for Prince George's County to locate the Affidavits. Additionally, to whatever extent Defendant Jarmon was misnamed, his name was taken from a copy of the citation upon which it is barely visible. *See* **Exhibit D**. Finally, approximately, one (1) month after the summonses expired, the COVID-19 pandemic through the State of Maryland into a state of emergency.

To whatever extent COVID-19 or the barely visible name interfered with the Sheriff's ability to provide all proofs of service in this matter, particularly where Defendant PGPD has failed to respond to discovery propounded on them as of August 25, 2021 and September 2, 2021. *See* **Exhibit L**. Nathaniel has met the burden of showing that there was good cause for any alleged failure in providing the same such that the time for service must be extended pursuant to FRCP 4(m). Further, Nathaniel hereby attaches all ten (10) of the Summonses issued

by the Circuit Court in the underlying case, two (2) of which were issued to unidentified persons and therefore were not served, and (1) that was served by the Montgomery County Sherriff's Office as to Defendant Han Kim who resides there.  *See* **Exhibit M**.  Additionally, Nathaniel includes copies of the checks made payable and cashed by the respective Sherriff's Offices, demonstrating that the Sheriff was hired by Nathaniel to carry out service on the Defendants, particularly as it relates to the PGPD Defendants; in fact, the Sherriff was hired at the same exact time to serve each PGPD Defendant.[9]  *See  id.*  One check for Forty Dollars ($40) was cashed by the Montgomery County Sherriff and accounts for the only the summons issued to Defendant Han Kim.  *See id.*  The other check is for Two Hundred and Eighty Dollars ($280) and accounts for the remaining seven (7) summonses served in Prince George's County which cost Forty Dollars ($40) for service of each summons.  *See id.*

Nathaniel had no reason to request that the time for service be extended as to the PGPD Defendants since he, by and through undersigned counsel, since it was believed that serviced had, in fact, been effectuated upon all of the PGPD Defendants with the filing of the Answer.  Further, only in Defendant PGPD's Motion did Nathaniel, by and through counsel, become apprised that Defendant Jamon was, in fact, Defendant Jarmon.  Therefore, Defendant PGPD's argument that Nathaniel failed to file a proper motion under Rule 6(b) to obtain an extension is entirely without merit.  Rule 6(b) does not require Nathaniel to file such a motion; rather, it states:

> [w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time: (A) with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires; or (B) on motion made after the time has expired if the party failed to act because of excusable neglect.

---

[9] It defeats logic to believe that Defendant PGPD was served by the Sheriff, but its officers and/or employees were not.

Fed. R. Civ. P. 6.  Since service was not, in fact, delayed, no such motion was or is required. Rather, "[f]ailure to prove service does not affect the validity of service. The court may permit proof of service to be amended."  *See* Fed. R. Civ. P. 4.  There is no requirement in Rule 4 that allocates a specific time period within which an affidavit of service must be filed.  *See id.* However, [t]o the extent the Sheriff is unable to timely locate proof that it served Defendants Stawinski and Jarmon as a result of COVID-19, which to date, it has thus far been unable to do despite available records that a request for such service was, in fact made, see Nathaniel's Requests for Waiver of Service of Summons, attached hereto as **Exhibit N**.

That all being said, this Court should deem service upon all of the PGPD Defendants as effective despite the arguments raised in PGPD's Motion.  When as here, Defendants are not required to be served personally, service is effective so long as it is left with an agent authorized by appointment or by law to receive service of process for the individual.  Md. R. Civ. P. Cir. Ct. 2-124.  Defendant PGPD cannot establish that such service did not occur given that both Defendant Stawinski and Jarmon are easily known to it since they are its employees and already filed an Answer wherein both employees responded to the claims lodged against them.  *See* Docket, at No. 13.  Additionally, both employees are sued in their professional capacities and both employees have easily distinguishable names, particularly Defendant Stawinski who also served as Defendant PGPD's Chief of Police in 2019 when both it and he were served in this action.  It is inferable from the record that since PGPD received service in this case, despite its new arguments that such service was improper or otherwise ineffective, that the Sherriff – a member of Defendant PGPD's own law enforcement community – also provided PGPD with service of process as to the other Defendants and left such process with whatever authorized

agent with whom it left the summons issued to PGPD, especially its then Chief of Police.  There is no other narrative which makes sense.

As to the unknown employees of PGPD, those employees are known – they are known by PGPD, but thus far PGPD claims never to have received discovery propounded by Nathaniel in order to discern the names of those employees.  *See* **Exhibit L**.  Moreover, and yet again, if PGPD believed such unknown employees to be persons necessarily required to participate in this action (which it should have believed and had no reason not to believe) it could have raised a proper defense as to them, namely under Rule 12(b)(2), lack of personal jurisdiction; Rule 12(b)(4), insufficient process; Rule 12(b)(5), insufficient service of process; or Rule 12(b)(7), failure to join a party under Rule 19.  To the extent PGPD failed to do so (which it did fail to do) and continues to argue on behalf of those Defendants, it cannot now claim that those Defendants should be dismissed from the action when pursuant to Fed. R. Civ. Pro 19, Defendant PGPD held a duty to inform the Court that the individuals involved in interceding and/or investigating the Incident, especially the plain clothes officer who supervised such intercession or investigation, that such persons needed to be joined as a party to the action in order to enable the Court to issue an order requiring the same.  That PGPD did not uphold its duty to do so must not be rewarded by the Court.

Finally, by filing a Motion for Summary Judgment, which Defendants Stawinski, Jarmon, and Unidentified Officers clearly have done by and through the PGPD Motion, they have each waived their right to be dismissed from this action.  *See generally*, the PGPD Motion.  Had each of the aforementioned Defendants remained silent in this action, then the Court could have issued notice of failure to serve to Nathaniel and, finding that service remained outstanding, dismissed those Defendants from the case without prejudice or ordered that service be made

within a specified timeframe, but in PGPD's Answer to Nathaniel's Complaint, the *allegedly* unserved Defendants alleged defenses which, unfortunately for them, are not the same defenses they attempt to rely on presently.  *See* **Exhibit N**.  *See also* Fed. R. Civ. P. 4.

    2.  *Plaintiff's Negligence Claim is Not Barred by Governmental Immunity*

    Plaintiff's Negligence claim is not barred by governmental immunity.  Whether under common law qualified immunity or the statutory qualified immunity provided by the Maryland Tort Claims Act, a local government may not assert governmental or sovereign immunity to avoid the duty to defend or indemnify an employee established in this subsection and PGPD is, therefore, a proper party to be named as liable under Nathaniel's negligence claim.  *See Hines v. French*, 157 Md. App. 536, 570, 852 A.2d 1047, 1067 (2004).  To the extent any of the PGPD individual Defendants' conduct was within the scope of their duties and it is found that they acted without malice or gross negligence, PGPD and/or the County remains liable for their actions and cannot be dismissed from the action no more than could an insurance company.  *See id.*, at 562-63.

    A negligence claim can stand against any of the individual PGPD Defendants where a special relationship existed between he and the victim.  *See id.*, at 567-68.  In this matter, Nathaniel disputes that PFC Jarmon decided to issue him a citation independent of supervision; rather, PFC Jarmon was told by a plain clothes and likely off-duty supervisory officer to issue Nathaniel the citation.  *See* **Exhibit K**.  The plain clothes officer is an officer who Defendant J. Kim feels comfortable calling directly as to any security issues arise at the Liquor Store.  See Exhibit K.  Therefore, Nathaniel had a special relationship with the plain clothes officer as Nathaniel he relied on the presence of the plain clothes officer to ensure his safety when in the Liquor Store.  *See id.*  Thus, the plain clothes officer owed a special duty to Nathaniel because he

"affirmatively acted to protect . . . a specific group of individuals like [Nathaniel], thereby inducing [Nathaniel's] reliance upon the police protection.  *See id.*  Despite that special relationship, the plain clothes officer did nothing to protect Nathaniel, but instead acted to protect Nathaniel's attackers, the Largo Liquor Defendants.  *See id.*  Further, until July 1, 2022, the immunity of the State and of its units is waived as to tort actions to the extent the liability does not exceed $400,000 to a single claimant for injuries arising from a single incident or occurrence.  *See* Md. Code, State Gov't § 12-104.

3.  *Plaintiff's Section 1983 Claims as to Defendant PGPD are Properly Before this Court.*

Defendant PGPD's argument regarding § 1983 is entirely premised on the statement: "[i]n order to maintain a claim for a constitutional violation pursuant to § 1983 against a *municipality*," Nathaniel was required to plead a proper *Monell* claim, but the argument is utterly misplaced.  *See* PGPD's Motion, at p. 14-17.  Neither PGPD, nor Prince George's County is a municipality.  In Maryland, the term municipality includes cities, towns, and villages.  *See* **Exhibit O**.  Rather, *within* Prince George's County there are twenty-seven (27) municipalities.  *See id.*  In fact, Prince George's County possesses the largest number of municipalities within it than any Maryland County,  including Berwyn  Heights, Bladensburg, Bowie, Brentwood, Capitol Heights, Cheverly, College Park, Colmar Manor, Cottage City, District Heights, Eagle Harbor,  Edmonston,  Fairmount  Heights,  Forest  Heights,  Glenarden,  Harbor, Greenbelt, Hyattsville, Landover Hills, Laurel, Morningside, Mount Rainer, New Carrollton, North Brentwood, Riverdale Park, Seat Pleasant, University Park, and Upper Marlboro.  *See id.*  Prince George's County cannot both contain municipalities and define itself as one and since the PGPD is not a city, town or village, it cannot define itself as a municpality either.  *See id.*

4.  *Defendant Stawinski is a Proper Party.*

Defendant PGPD's argument that Defendant Stawinski must be dismissed from the action as to Nathaniel's Counts I, III, IX, X, and XI are also without merit.  Here, Defendant PGPD argues that (1) Nathaniel fails to allege any acts allegedly committed by Stawinski that violated his State Constitutional rights; (2) that there are no allegations that Stawinksi was present at the scene following the Incident; and (3) that there are no allegations that Stawinksi communicated with officers present at the scene or that they received orders from Stawinski while at the scene.  However, the theory of supervisory liability arises from the obligation of a supervisory law officer to ensure that his subordinates act within the law.   See *Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 203 (4th Cir. 2002).  Such a supervisor is obligated, when on notice of a subordinate's tendency to act outside the law, to take steps to prevent such activity.

This is not the first time J&H Beverage and Defendant J. Kim have taken steps to arrest an individual on the premises of the Liquor Store without law enforcement, but with the aide of law enforcement in the aftermath of his initial detainer of the suspect.  *See* **Exhibit E**.  In fact, many complaints have been lodged against Defendant J. Kim, both criminally and administratively, for such acts.  *See id.  See also* Exhibit A.  Further, since Defendant PGPD failed to provide discovery responses in this action, it is only in reviewing PGPD's Motion that Nathaniel became aware that the initial officer at the scene of the Incident was PCF Jarmon.  *See* **Exhibit K**.  Prior to, Nathaniel was under the impression that the plain-clothes supervisory officer who directed PCF Jarmon to issue a citation as to him was, in fact, PCF Jarmon.  *See id.* It is now clear that that is not the case, but both Defendant PGPD and Defendant  Largo Liquors have failed to disclose which other officers were present at the scene as a result of the Incident.

*See* **Exhibit L**.  Since, Nathaniel now alleges that it was the plain-clothes supervisory officer who insisted that PCF Jarmon issue Nathaniel a citation as a result of the Incident, whether that supervisory officer was, in fact, Defendant Stawinski, or—if a different—officer, the identity of that officer is an issue of fact to be determined by the jury.   *See* **Exhibit K**.  To the extent that supervisory officer was not Defendant Stawinski, there is still no reason to dismiss this action against him within the context of a motion for summary judgment because the recurring behavior of Defendant J. Kim is alleged to have occurred in cooperation with at least one (1) specific officer – the supervisory plain clothes officer and there have not only been complaints regarding that matter, but television news stories.    As a result, Defendant Stawinski, as the chief supervisory officer, must have or should have been aware that of the repetitive pattern of conduct carried out by the plain clothes officer in cooperation with Defendant J. Kim.  Where Defendant Stawinski was deliberately or negligently indifferent to that responsibility, he then bears some culpability for the plain clothes officers' illegal conduct, and he may be held vicariously liable for his illegal acts.  *See id.*, (citing *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994).  As such, it is a question for the jury as to whether Defendant Stawinski was legally assigned such responsibility and, as a result, is therefore culpable for the actions taken by his subordinate.

As to the unidentified police officers, Defendant PGPD argues that a judgment should be entered in their favor as to Counts I, III, IX, X, and XI; however, they do so on the basis that Nathaniel was not charged with a crime.  This is not an undisputed fact.  Rather, Nathaniel was charged with disorderly conduct—a charge that was later dismissed.   *See* **Exhibits C**, **D**, and **E**.  To the extend Defendant PGPD intends to persuade the Court that the citation issued did not amount to charging him with a crime, the Prince George's County Police Department's General Order Manual states that "[t]he use of the Maryland Uniform Criminal Citation is an alternative

to physical arrest . . . Officers shall charge the suspect by citation if [certain] criteria have been met . . ."  Therefore, that Nathaniel was issued a citation does not somehow mean that he was not charged with a crime.  As such, it is for the fact finder to determine whether, under all of the facts and circumstances deriving from the Incident, in detaining and charging Nathaniel, did Defendant PGPD violate Nathaniel's Constitutional rights or otherwise violate the law.  As such, no PGPD officer involved in such detainment and/or issuance of the citation to Nathaniel can or should be released from this action as a result of summary judgment.

Defendant PGPD argues that PFC Jarmon possessed probable cause to detain Nathaniel and issue a criminal citation for disorderly conduct, but the very substance of probable cause renders its existence a question for the fact finder to determine; it is therefore not a thing that exists as a matter of law.  Further, even if Nathaniel's behavior during the Incident met the criteria under the Prince George's County General Order Manual, Vol. II, Chapter 4, Section V, Subsection 1, it also certainly had probable cause by which to conduct a warrantless arrest of at least one (1), if not all, of the Largo Liquor Defendants who PGC Jarmon admits engaged in a physical altercation with Nathaniel on the basis of him knocking some store property off of the cash counter.  *See* **Exhibit C**.  The juxtaposition of that physical altercation and Nathaniel's aforementioned behavior clearly evidences excessive forced used against Nathaniel to the extreme, even to the extent that onlookers were outraged by the behavior of the Largo Liquor Defendants.  Yet no PGPD officer saw fit to take any punitive measure against the Largo Liquor Defendants.

Probable cause is "defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.  *See Rogers v. Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001).   Taking all of the facts and

circumstances derived from the Incident into consideration, no prudent man would believe that Nathaniel had committed an offense which should have amounted in punitive measures as to him, but not greater punitive measures as to the Largo Liquor Defendants and certainly would not find it reasonable that the Largo Liquor Defendants received no punitive measures at all. Thus, it is for the fact finder to determine if the officer properly cited Nathaniel; if that citation was issued under the any improper influence of persons within the PGPD who enjoyed an outside relationship with Defendant J. Kim; and if there existed probable cause upon which to effectuate the citation at all, or if any PGPD officer acted with as much malice toward Nathaniel as it did compassion (or preferential treatment) toward the Largo Liquor Defendants. *See Chapman v. Nash*, 121 Md. 608 (1913).

When there is no probable cause, malice may be inferred. *See Hooke v. Equitable Credit Corp.*, 42 Md. App. 610 (1979). A police officer is responsible for malicious prosecution if the officer acts with malice. *See* MARYLAND TORT LAW HANDBOOK, False Imprisonment, § 4.7. To boot, if a deprivation occurs unlawfully, it constitutes a false imprisonment and/or arrest without regard to whether it is done with or without probable cause. *See id.*, (*citing Lewin* v. Uzuber, 65 Md. 341, 4 Atl. 285). If detaining Nathaniel was done unlawfully and amounts to a false arrest, then Defendant PGPD committed an assault, as well as a battery upon Nathaniel when it detained him. These are all questions for the finder of act and not appropriate to be decided as a result of a summary judgment motion. Again, no PGPD officer involved in such detainment and/or issuance of the citation to Nathaniel can or should be released from this action as a result of a summary judgment ruling.

3.      THE LARGO LIQUOR DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Nathaniel disputes the entirety of the statement of material facts set forth in the Largo Liquor Defendants' Motion since, like their co-defendants, they significantly dilute what took place during the Incident between the Parties.  Additionally, Nathaniel sets forth specific disputes as to statements delineated as facts set forth by the Largo Liquor Defendants' Motion as delineated herein below:

a.      **Disputed Facts**

Nathaniel disputes No. Four (4) of the Largo Liquor Defendants' Statement of Undisputed Material Facts as to its characterization of Nathaniel as the individual who escalated the dispute, as well as that he knocked a box of slim jims off of the counter.  Who escalated the dispute is a question of fact for the fact finder, but the Video depicts that just prior to Nathaniel knocking items off of the Liquor Store Counter, The First Store Clerk defined him as queer; denied him service; and invited Nathaniel to throw the first punch.  See Statement of Undisputed Facts, at ¶¶ 13-27 (*supra*).  Those incidents were the first point at which the encounter between he and Nathaniel escalated.  *See id.*  Additionally, the Video depicts that the slim jims remained on the Liquor Store counter following Nathaniel's knocking of the items on the counter.

Nathaniel disputes No. Five (5) of the Largo Liquor Defendants' Statement of Undisputed Material Facts.  The Store Clerks did not attempt to place Nathaniel in a hold; rather they assaulted him.  *See id.*, at 31-45 (*supra*).  Also, Defendant J. Kim is the only individual who placed Nathaniel in handcuffs, although the Store Clerk's assisted him in doing so inasmuch as they restrained Nathaniel as he did so.

Nathaniel disputes the Largo Liquor Defendants' Statement of Undisputed Material Facts inasmuch as it fails to account for the plain clothes officer who intervened in Nathaniel's detainment and the citation issued to him.

Nathaniel disputes No. Eleven (11) of the Largo Liquor Defendants' Statement of Undisputed Material Facts inasmuch as it states that the criminal citation issued to him was in compliance with the Prince George's County General Order Manual.   Whether it was in compliance with aforesaid Manual is a question of fact for the fact finder to determine in consideration of all of the facts and circumstances. Contrary to the Largo Liquor Defendants' position, Nathaniel's failure to respond to discovery responses which he received by mail long after the discovery deadline do not qualify as an admission.  Undersigned attempted to request an extension by which to respond given the late delivery and an agreement that the discovery deadline should be extended, but opposing counsel never responded to that email.  *See* **Exhibit P**.  No electronic copy of the Requests were provided at the time they were propounded and the Largo Liquor Defendants cannot now benefit from the failures of their counsel to make any attempt to resolve a discovery dispute, late provide the discovery requests, and failure to agree to extend the discovery deadline in order that their Requests might have been responded to. [10]

b.    <u>**Argument**</u>

1.    *Nathaniel's Actions Did Not Amount to a Breach of the Peace.*

The Largo Liquor Defendants argue that they were legally justified in making a citizen's arrest because the act of knocking some items off of the Liquor Store counter amounted to a breach of the peace.  *But see* this Motion, at Section D(1)(a) (*supra*).  However, under the statute, Nathaniel's reaction was not willful as a breach of the peace requires since an act cannot by

---

[10] The Largo Liquor Defendants also entirely failed to respond to any of Plaintiff's discovery requests and, thereafter, failed to communicate regarding that failure.  *See id.*

definition be both willful and incited.  *See id. See also* Md. Code Ann., Crim. Law § 10-201.   By

its very nature, a provocation eliminates a person's will power.   See this Motion, at Section

D(1)(a) (*supra*).   As such, this Court should grant Nathaniel's Motion for Summary Judgment as

to the same Count.   Should the Court find that there exist a determination to be made by the fact

finder as to Nathaniel's argument, the Court cannot grant the Largo Liquor Defendant's Motion

as to this Count either.

2.   *Plaintiff's Possesses Many Genuine Disputes as to the Largo Liquors Rendition of the Material Facts.*

The Largo Liquor Defendants argue that on the basis of the undisputed material facts,

Counts I (Violation of Maryland Declaration of Rights Art. 24-Unlawful Seizure), II (Violation

of Section 1983-Unlawful Seizure), III (False Imprisonment), IX (False Arrest), X (Battery), XI

(Assault), XVII (Excessive Force), XIV (Negligence), and XV (Gross Negligence) should all be

resolved via summary judgment based on a six-sentence summary of the facts.   Considering that

Nathaniel disputes the entirety of that six-sentence summary and offers in comparison an eighty-

two (82) paragraph rendition of what the undisputed facts are which contradicts and/or

undermines both the Largo Liquor Defendants' summary version and their more lengthy, equally

misrepresentative fourteen (14) paragraph narrative, the Court must find that there is a dispute as

to the material facts which they allege support their motion.

Specifically, but not hereby limited, Nathaniel disputes that there was a legal justification

for the detention which is the rationale behind his Count IV (Civil Conspiracy) whereby he

alleges that upon the insistence of who is only now known to be a plain clothes officer not

identified as PFC Jarmon, PFC Jarmon issued him a citation for disorderly conduct.  *See* **Exhibit**

**K**.  Not coincidentally, the Largo Liquor Defendants entire hopes for a judgment in their favor

rests solely on that one (1) act—an act which Nathaniel has always maintained occurred at the

41

insistence of a plain clothes officer who was supervisory to PFC Jarmon.  *See id.*  In fact, prior to the arrival of the plain clothes officer, PFC Jarmon had earlier communicated to Nathaniel an intent to release him without any charges or citations on the bases of what he observed in the Video.  *See id.*  The Largo Liquor Defendants should not be afforded a judgment in their favor based upon a citation Nathaniel alleges to have been issued at the insistence of a plain clothes officer familiar with Defendant J. Kim.  *See id.*  Where these claims are not deemed to be in Nathaniel's favor as a matter of law, they must go to the fact finder, particularly as to the issue of whether PFC Jarmon was instructed to issue the citation; and, if so, who he was instructed by; whether that instruction was given as apart of a conspiracy to help the Largo Liquor Defendants to avoid liability as to their actions during the Incident; whether that instruction was properly given; and whether the resulting citation is, in fact, a lawful one.

Further, Nathaniel disputes that only the force necessary to hold the Plaintiff was the level of force actually employed by the Largo Liquor Defendants.  *See generally* Video.  In fact, none of the reasonable patrons of Largo Liquors held that believe.  *See id.*, at 4:45-4:59.  Rather, they expressed outraged and screamed at the Largo Liquor Defendants that they were choking Nathaniel.  *See id.*, at 4:45.  Even if the Largo Liquor Defendants were correct in their position that only the amount of force necessary to hold Nathaniel was used, whether a hold of Nathaniel was necessary at all is a question of fact for the fact finder to determine*. See Paul,* 256 Md. 643, 655–56, 261 A.2d 731, 738–39 (1970).  Finally, even if the Largo Liquor Defendants are correct that the amount of force used was only the amount necessary to hold Nathaniel until law enforcement arrived, they had no need to hold him until law enforcement arrived because Nathaniel showed the First Clerk his identification and the First Clerk was aware of his identity which Nathaniel never attempted to conceal.  As such, they

42

could have reported him to law enforcement without holding him on the premises or asked for his identification again and, moreover, the use of handcuffs was not a necessary use of force in order to detain him.   Outside of observing disorderly and dangerous conduct, Maryland has carved a very limited circumstance in which a private person may use handcuffs to detain an individual:  to prevent theft or recapture property, which Nathaniel did not take.   *See* **Exhibit Q**.

        3.     *Civil Conspiracy is Not Alleged Against the Largo Liquor Defendants as a Collective.*

The Largo Liquor Defendants argue that the count of civil conspiracy should be determined in their collective favor, but Nathaniel's civil conspiracy claims are not lodged against the Largo Liquor Defendants collectively.   Rather, they are lodged against Defendants J. Kim; PFC Jarmon; and Unidentified Officers.   However, given new information derived from Defendant PGPD's Motion, Nathaniel now understands PFC Jarmon to be the officer depicted on the Video.   He previously believed that the plain clothes officer then on the scene had issued and signed the citation Nathaniel received since the plain clothes supervisory officer is the one who insisted that such a citation be issued to him after PFC Jarmon had earlier communicated his intent to release Nathaniel without charge.   That all being said, the Court cannot find in favor of the Largo Liquor Defendants on the count of civil conspiracy because their argument is based on facts which Nathaniel agrees with:  it was not the Largo Liquor Defendants who conspired; rather, it was Defendant PGPD by and through the plain clothes officer who Nathaniel overheard Defendant J. Kim speaking with on the telephone in advance of his arrival to the scene of the Incident.   Therefore, Nathaniel did not allege civil conspiracy as to the Largo Liquor Defendants and the Largo Liquor Defendants' argument is not actionable at this summary judgment phase of the litigation.

4.    *The Legitimacy of Nathaniel's Intentional Infliction of Emotional Distress Claim is Based on a Variety of Factual Determinations Which Must Be Made by the Fact Finder.*

Again, Plaintiff agrees with the Largo Liquor Defendants:  Intentional Infliction of Emotional Distress claims are reserved for conduct which is "abominable" and "utterly intolerable in a civilized society" or "opprobrious behavior that includes outrageous conduct." *See Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 326 Md. 663, 670 (1992).  The term "opprobrious" is defined as "the disgrace that traditionally follows from, or is attached to, wrongdoing, esp. after its public revelation.  *See* OPPROBRIUM, Black's Law Dictionary (11th ed. 2019).  *See also* the Video which was broadcast on several news stations and covered by other news mediums; lead to a march led by the National Association for the Advancement of Colored People; and inspired a petition signed by more than 6,000 citizens.  *See* **Exhibits A** and **E**.

Despite being on the same page as to what constitutes a claim of Intentional Infliction of Emotional Distress, the Largo Liquor Defendants differ in their perspective as to its applicability under the circumstances now at issue.  In fact, they state, "[t]he Plaintiff has failed to produce a scintilla of evidence that the Defendants' conduct . . . rises to 'abominable,' 'outrageous,' or 'intolerable in a civilized society.'"  To this, Nathaniel refers the Largo Liquor Defendants (and the Court) to the Video, and further to the News Articles and other documents attached hereto as **Exhibit E**, and even further to the Petition signed by more than 6,000 citizens, attached here to as **Exhibit A**, or the decision of the Liquor Board, also attached as **Exhibit A**.  By these, Nathaniel assures the Court that there is far more than a *scintilla* of evidence that the Largo Liquor Defendants conducted themselves in an intentional and reckless manner, using extreme and outrageous conduct and that there is a causal connection between their conduct and

44

Nathaniel's severe emotional distress.  Further, whether any of that is true is a question from which a jury can derive inferences and the legitimacy of the claim therefore turns on a question or questions of fact for the fact finder to determine.  *See Anderson,* 477 U.S. 242, 248–51 (1986).

      5.      *The Legitimacy of Nathaniel's Intentional Misrepresentation Claim is Based on a Variety of Factual Determinations Which Must Be Made by the Fact Finder.*

Plaintiff's claims against the Largo Liquors Defendants include Misrepresentation, Fraud, and Deceit, but may also be identified as Negligent Misrepresentation, Fraudulent Misrepresentation and Deceit, all common law claims.  To the extent the Largo Liquor Defendants argue that intentional misrepresentation should be adjudged in their favor at the summary judgment phase of this action, Nathaniel responds that whether a false representation was made to him is a question of fact for the fact finder to determine.

In presenting themselves as having the right or legal ability to conduct the actions against him which are depicted in the Video, including handcuffing him without proper certification, whether their actions misrepresented the truth; whether they knew that their actions misrepresented the truth; whether their actions were performed with such reckless disregard from the truth that knowledge of the falsity of the statement should be imputed to onto them; whether those actions were completed for the purpose of defrauding Nathaniel; whether Nathaniel relied on those misrepresentations with our without justification; and whether he suffered money damages as a result are all questions of fact for the fact finder.  *See Hoffman v. Stamper*, 385 Md. 1, 28-31 (2005).  *See also* **Exhibit B** and the Video.  Further, it is clearly audible on the Video that Defendant J. Kim at least informs Nathaniel that if he does not change his behavior he will be charged with disorderly conduct.  *See* the Undisputed Material Facts, at ¶ 59 (*supra*).  A reasonable fact finder could infer that his statement misrepresented that he possessed some legal authority to so charge him.  *See Anderson,* 477 U.S. 242, 248–51 (1986).  Moreover, during the

conversation Defendant J. Kim had with the plain clothes officer which Nathaniel overheard, Defendant J. Kim had an extensive discussion regarding what "they" were going to charge Nathaniel with.  *See* **Exhibit K**.

      6.    *The Legitimacy of Nathaniel's Claims of Intentional and/or Negligent Interference with Prospective Advantage Claim is Based on a Variety of Factual Determinations Which Must Be Made by the Fact Finder.*

A claim for intentional interference with prospective advantage requires (1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.  *See K & K Mgmt., Inc. v. Lee*, 316 Md. 137, 155, 557 A.2d 965, 974 (1989). Negligently engaging in the same conduct changes the factors by including that if the Defendatn did not know that his actions would lead to actual damages, he should have known.  *See id.*  A Defendant commits this tort where he prevents an individual from performing the a contract or causes the performance to be more expensive or burdensome.  *See id.*  Where the Defendant intentionally and improperly interferes with the individual's contractual relation depends on whether the whether the interference consists of (a) inducing or otherwise causing the Employer not to enter into or continue the prospective relation or (b) prevents the individual from acquiring or continuing the relationship or prospective relationship.

The Largo Liquor defendants acted intentionally in their assault upon and detainment of Nathaniel.  *See* the Video.  Their actions were calculated to cause damages to Nathaniel—or they should have reasonably deduced that their actions would cause damages to Nathaniel—at least in as much as they intended to beat him up and/or inasmuch as they intended to have him arrested

and disciplined by law enforcement.  If their intent was to have Nathaniel arrested, then Defendants also intended for him to have consequences at his place of employment.

Given that The First Clerk was the actual party responsible for inciting the entirety of the Incident, he had no lawful purpose to have Nathaniel arrested, nor any justifiable cause.  *See* the Video.  Rather, he intended to cause Nathaniel actual damage and loss which did so occur when Nathaniel began to suffer emotionally as a result of what he at least believed to be acts which resulted from racism, but which we now know resulted from homophobia, if not both racism and homophobia.  *See* the Video.  The acts by Defendant J. Kim and the Second Clerk in support of the First Clerk's agenda ultimately caused Nathaniel's then-employer to terminate him and prevented Nathaniel from being able to meaningfully or actively perform his job such that he was prevented from continuing that employment and was further prevented from being able to secure a full-time position with his then employer outside of what was then his probationary status.  *See* **Exhibit H**.  Therefore, whether Defendants intentionally or negligently interfered with Nathaniel's prospective economic advantage depends on questions of fact for the fact finder to determine and those claims cannot be adjudged in favor of the Largo Liquor Defendants at the summary judgment phase of this litigation.

7.    *The Largo Liquor Defendants Certainly Made a Publication to the Public; Whether that Publication was Made to the Public At Large is of No Consequence.*

The Largo Liquor Defendants argument against Nathaniel's Invasion of Privacy/False Light Claim is entirely without merit.  In fact, the statement that Nathaniel failed to show they made a publication to the public at large is a fallacy at best.  Its alleged source for the "at large" requirement it sets forth is *Furman v. Sheppard* which does not once use the word "large" anywhere in the entirety of the document.  See generally 130 Md. App. 67, 744 A.2d 583 (2000). Rather, *Furman* explains that the disclosure must be a public one and not a private one.

47

The reality is that the Largo Liquor Defendants allowed at least twenty-six (26) random citizens to enter its premises while it had Nathaniel inside handcuffed in the front of the Liquor Store which Nathaniel alleges they did without lawful justification.  *See* the Video; *see also* this Motion at Section D(1)(c) (*supra*).  As the citizens enter and depart the Liquor Store, they observe the Nathaniel; they inquire about the Incident; they are responded to by the Clerks regarding the Incident; and Defendant J. Kim loudly discusses the Incident, including, but not limited to, repeatedly alleging that Nathaniel was breaking things, which Nathaniel was not doing.  *See* the Video.  Defendant J. Kim knew that stating Nathaniel was breaking things was a lie because the Clerks earlier informed him that the Incident resulted when Nathaniel knocked over some things on the counter.  *See id.*  Thus, Nathaniel does possess an *iota* of evidence to justify this claim; and further, enough *iotas* of evidence to justify a summary judgment award in his favor as to it.  *See* this Motion, at Section D(1)(c) (*supra*).  As such, the Largo Liquor Defendants must not succeed as to their summary judgment motion where it regards Nathaniel's claim of Invasion of Privacy/False Light.

**WHEREFORE**, Plaintiff, Nathaniel F. Davis, II, requests this Honorable Court grant his Motion for Partial Summary Disposition and deny the Co-Defendants' Respective Motions for Summary Judgment**.**

THE LAW OFFICE OF
CHRISTINA J. BOSTICK

Christina J. Bostick, Esquire
CPF No.:  1012140073
*cjbostick@bosticklawoffice.com*
9520 Berger Road
Ste. 212
Columbia, Maryland 21046
(443) 832-3259

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of December 2021, a copy of the foregoing

was sent via CM/EFS to:

Robert B. Hetherington, Esq.
2200 Research Boulevard, Suite 500
Rockville, Maryland 20850

*Attorney for Defendants Jay Chang Kim,
Han K. Kim, J and H Beverage Inc. d/b/a
Largo Liquors, Wallace Kent Roos, Jr.,
Seung Bong Han, Venancio Gomez Garcia,
Adam C. Kim*

Shelley L. Johnson, Esq.
1301 McCormick Drive, Suite 4100
Largo, Maryland 20774

*Attorney for Defendant Prince George's
County Police Department*

Christina J. Bostick

49